## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

_____

KARLENE K PETITT                                          2:20-cv-001569 RSM

      Plaintiff,

v.

AIR LINE PILOTS ASSOCIATION

      Defendant.

_____/

## PLAINTIFF'S FIRST COMPLAINT

PLAINTIFF DEMANDS TRIAL BY JURY

 

Karlene Petitt
19671 Military Rd S
SeaTac WA 98188
(206) 856-2445

This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000e et seq. Plaintiff commenced this action within 90 days after receipt of his right to sue letter.

## COMPLAINT

COMES NOW, Plaintiff, Karlene K Petitt, and hereby files her Complaint against the Defendant,  AIR LINE PILOTS ASSOCIATION, and says:

### I.  JURISDICTION AND VENUE

1.      Plaintiff Karlene K Petitt on behalf of herself brings this action against defendant Air Line Pilots Association (ALPA).  The suit is based upon defendant's failure to represent her due to her gender, pursuant to 42U.S.C. § 2000e et. seq.  Plaintiff commence this action within 90 days after receipt of her right to sue letter, which was issued on August 13, 2020. This Court has original federal question Jurisdiction over the claims asserted by Plaintiff pursuant to 28 U.S.C. §§ 1331 and 1337.  Venue is proper pursuant to 28 U.S.C. § 1391 (b) and (c) since defendant is an unincorporated association which has numerous members and substantial contacts in the state of Washington, defendant's Local Executive Council (LEC) designated to represent the plaintiff's interests is located in the State of Washington, and the defendant resides in the state of Washington and is therefore subject to personal  jurisdiction.

### II.  PARTIES

2.      Plaintiff, Karlene Petitt (Petitt), is a citizen of the United States, who resides in the State of Washington.  At all times relevant to the facts and claims asserted herein, Plaintiff was (and continues to be) a member in good standing of the Defendant Air Line Pilots Association and a pilot who is covered under the Collective Bargaining Agreement between Delta Air Lines, Inc., (Delta) and the pilots of Delta as represented by the Air Line Pilots Association (ALPA).

3.      Defendant ALPA is a labor organization with its principal office in Washington DC, an LEC designated to represent the Plaintiff in the State of Washington, and numerous members residing in the state of Washington.  ALPA is the exclusive representative of the pilot employees in the service of Delta Air Lines, Inc. and is entitled to act for, and negotiate collective bargaining agreements on behalf of, all pilots in the bargaining unit. Delta is an agency shop mandating Plaintiff pay dues to ALPA as a condition for employment, otherwise the pilot is subject to termination. ALPA controls the ALPA Aeromedical Service, doing business as Aviation Medical Advisory Services (AMAS), which has been providing Aeromedical consultation to ALPA members since 1969.  In reference to ALPA's Delta-specific operations, ALPA is sometimes referred as Delta Air Line Pilots Association (DALPA).

### III. FACTUAL BACKGROUND

### Employment History

4.       Plaintiff Karlene Petitt (Petitt) is, and at all relevant times was, employed by Delta as an airline pilot.  Northwest Airlines, Inc. (NWA) employed Petitt effective January 17, 1997. On October 29, 2008, NWA and Delta merged, and NWA became a wholly-owned subsidiary of Delta. Petitt' s date of hire with NWA became her date of hire with Delta after the merger. She is type-rated on the A350, B777, B747-400, B747-200, B767, B757, B737, B727 and A330 aircraft.

5.      Petitt is both a pilot and an expert on aviation safety. She holds MBA and MHS degrees, and a PhD in Aviation from Embry Riddle Aeronautical University with a focus on airline safety.

6.      Throughout her employment with Delta and NWA, Petitt has continuously attempted to call any flight safety issues to the attention of her superiors and she has proposed

solutions to many safety deficiencies, including violations of Federal Aviation Administration (FAA) regulations and other aviation safety standards. Even with active recruiting efforts, the Delta pilot workforce remains less than seven percent female. Women who entering the pilot workforce are frequently confronted with hostility from management representatives within the Flight Department, from rank-and-file pilots, and from the labor union that represents them.

## History of Events

7.      On May 31, 2011 Petitt wrote an educational blog post in response to an AF447 crash to educate pilots to avoid another event like the Air France Airbus A330 that fell into the ocean killing 228 people. On June 30, 2011 Petitt received a Letter of Counsel from Delta in response to that post. Delta uses Letters of Counsel to lay the foundation for future and more severe disciplinary action. Petitt requested a grievance to have the Letter of Counsel removed from her record. ALPA advised her she was not allowed to grieve the Letter of Counsel, and it would be automatically removed from her file in two years. However, this letter was subsequently utilized as the pretextual rationale for Delta's demand that Petitt submit to a compulsory mental health evaluation five years later. ALPA's advice to Ms. Petitt that she was not permitted to grieve the Letter of Counsel was discriminatory, arbitrary and in bad faith because, as she later discovered, she could have filed a grievance protesting the Letter of Counsel. Delta Air Line's Labor Relations Attorney Chris Puckett (Puckett) stated that not only she could have filed a grievance, but also could have written a rebuttal. Petitt has been unable to locate a male pilot who was denied the right to a grievance of a similar nature.

8.      In 2015, FAA Administrator Michael Huerta promulgated new federal regulations mandating that United States air carriers adopt and implement a program referred

as a Safety Management System (SMS), which, *inter alia*, would promote safety and compliance reporting by rank-and-file airline employees. In early November 2015, Petitt attended Flight Safety Foundation's annual International Air Safety Summit in Miami Beach, Florida. Richard Anderson (Anderson), then Chief Executive Officer of Delta, gave a presentation about aviation safety and discussed Delta's implementation of its FAA-mandated SMS program. Anderson stated that he had empowered his employees to be proactive about safety issues and that he supported airline employees sharing information and bringing safety concerns to the attention of their employer, and it was the employee's "unfettered responsibility" to do so.

9.     Petitt was inspired by Anderson's expressed commitment to transparency and SMS, but this position conflicted with many operational practices that she had observed during her employment with Delta. Accordingly, in an e-mail to Delta Regional Director, Chief Pilot Phil Davis (Davis) dated November 3, 2015, Petitt addressed certain failures of Delta to adhere to its purported open door policy regarding safety concerns, pointing out instances in her own experience when she had tried to convey her concerns but the employer had retaliated against her with false allegations of misconduct and a discriminatory application of unpublished and/or arbitrary rules. Petitt concluded the e-mail by stating that she wanted to be proactive and help the airline address safety and accountability issues, and she requested a meeting with Captain Steve Dickson (Dickson), Senior Vice President of Flight Operations, and Captain Jim Graham (Graham), Vice President of Flight Operations and Chief Pilot, to discuss these matters.

10.     Petitt spent the next two months attempting to schedule a meeting with Dickson and Graham. On two occasions in November and December 2015, Captain Jud

Crane (Crane), a LEC representative of ALPA in Seattle, warned Petitt that Delta would retaliate against her in the form of Section 15 if she pursued such a meeting, suggesting that the employer would falsely accuse her of being mentally unstable and ground her from active flight duty. However, recognizing the serious nature of Delta's ongoing violations of established safety standards and the importance of bringing the issues to light, Petitt persisted until she was granted a meeting. At this time, Crane provided no substantiation of his warning with respect to Delta's retaliation other than it was something Delta had done in the past and could do to her if she pursued her efforts, an intentional act of omission to withhold the information. Not until a year later, did Petitt learn that Crane had learned of the November 9, 2015 email communications in which Graham had advised Regional Director OC Miller (Miller) of his intention to subject Petitt to a compulsory psychiatric evaluation pursuant to Delta's discretionary authority under Section 15 of the collective bargaining agreement. Miller had advised Seattle Chief Pilot Rip Johnson and Crane of this email. Graham had not only advised Miller on November 9, 2015 of his intent to follow through on the compulsory psychiatric evaluation, but he communicated to his superior, Dickson, of his intentions after the subsequent January 28 meeting occurred that Petitt would be a candidate for the psychiatric evaluation.

11.     On January 27, 2016, Petitt met with ALPA attorney Rachel Samuda (Samuda) and ALPA Contract Administrator Hartley Phinney (Phinney) for the better part of three hours, during which time Samuda attempted to dissuade Petitt from providing a copy of her written safety report to senior management in a meeting scheduled for the following day.  The content of that report included the identification of Delta violations of federal aviation regulation, training concerns, lack of pilot proficiency, violations of

Delta's FAA-mandated SMS program, and examples of a negative safety culture – issues that paralleled her doctoral research. Samuda read the report Petitt intended on giving to senior executives the following day, and on the morning of January 28, 2016, Samuda once again, made every effort to convince Petitt to communicate her safety issues in an exclusively oral manner. Thus, notwithstanding her legal training, Samuda attempted to convince Petitt that she would be better off by proceeding without any documentation of the protected activity that ALPA anticipated would subject Petitt to retaliatory action by Delta, demonstrating bad faith.

    12.    On January 28, 2016, Petitt finally met with Dickson and Graham. During the meeting, regardless of ALPA's objection to producing a written report, Petitt presented Dickson and Graham with copies of a lengthy report she had prepared regarding Delta's safety culture and SMS program that detailed numerous and specific examples of regulatory and policy violations.

    13.    On or about February 5, 2016, Graham contacted Petitt and asked her to give a presentation on SMS to a group of divisional leaders in the near future. However, on February 17, 2016, during the discussion for the arrangement of that very meeting, Graham informed Petitt that her report had been submitted to Delta's legal department for review, and that the employer would send an investigator to Seattle to interview her as part of an internal investigation. She met with the "investigator," Kelley Nabors (Nabors), on March 8 and discussed her safety report and presentation. Unbeknownst to Petitt, the "investigator" was a manager of the pass travel complaint department and equal opportunity department who lacked flight safety knowledge, had never interviewed a pilot, lacked any background with federal aviation regulatory compliance, was afraid of flying, and refused to believe that Delta would

7

bypass safety protocols  and violate regulations. This meeting was conducted in a hotel lobby without union representation. Nabors returned to Atlanta and took March 9, 2016 off of work.

14.     On March 9, 2016, Bastian met with Graham and Executive Vice President and Chief Legal officer, Peter Carter for thirty minutes regarding Petitt subsequent to his receipt of Petitt's safety report. Ed Bastian had never been involved in a pilot's Section 15 prior to his involvement in the Petitt matter.

15.     On March 10, 2016, a teleconference was arranged in which Nabors communicated her concerns regarding Petitt's alleged emotional state to Puckett, Delta corporate attorney Meg Taylor, and EO Supervisor Manager Melissa Seppings (Seppings). On the same day, without any prior contact with Petitt, Puckett emailed psychiatrist Dr. David B. Altman (Altman) seeking his assistance in evaluating Petitt. Altman is not an Aviation Medical Examiner (AME), and the process in which Puckett selected him was in violation of the Pilot Working Agreement (PWA). On August 5, 2020, Dr. Altman's medical license was revoked on the grounds that he had engaged in improper conduct by rendering a false medical diagnosis for the purpose of advance the interests of Delta Air Lines.

16.     On March 15, 2016, Petitt had a meeting with Davis, and addressed Delta's violation of the FAA's pilot fatigue rules arising from Delta's unlawful practice of not counting a pilot's deadhead flight time toward his/her pilots' duty time, and that it could lead to pilots flying aircraft while fatigued, and was in violation with federal standards. In response to Petitt's whistleblower action, the FAA issued a letter confirming that it had determined that Delta's practices in this regard constituted a violation of federal aviation regulations. At all times these duty-time violations had been ongoing, ALPA representatives were aware of Delta's practices.

17.     On March 17, a teleconference was held including Graham, Nabors, Puckett, Delta Director of Health Services (DHS) Dr. Thomas Faulkner (Faulkner), and Altman, the Delta-selected psychiatrist. By the close of the teleconference, Graham decided to ground Petitt and subject her to compulsory psychiatric evaluation. Notwithstanding Graham's repeated communications in November 2015 regarding his consideration of a Section 15 referral for Petitt, Delta averred in its interrogatory responses that the definitive cause of the Section 15 referral was the Nabors-Petitt interview of March 8, 2016. Furthermore, Graham did not convey to anyone at this meeting that, in 2015, he had previously determined that he desired to subject Ms. Petitt to compulsory psychiatric examination.

18.     On March 21, 2016, Petitt conferred again with Crane. When she asked why Crane had previously warned her that she would be subjected to retaliation if she presented her safety report to Delta, he mentioned that he had heard others discussing her reports of safety issues. He told Petitt that he had warned her because Delta had retaliated in a similar manner against pilots who reported safety concerns in the past. However, Crane did not advise Petitt that Captain Representative Pat Harney had warned Crane a year earlier, 2014, that company was "gunning" for Petitt, and that she "had a target on her back" and she needed protection.

19.     During this 2014 timeframe, Miller admitted to Crane that there was nothing that could be done, as Petitt's case was on the "4th floor," identifying a management level with which ALPA would not wish to contend. Petitt was also warned by line pilots that she had a target on her back.

20.     On March 22, 2016, Davis directed Petitt to report to his office, with ALPA representative Crane. Davis presented her with a written notice which stated in relevant part:

> This letter is to inform you that you have been removed from service with pay for purposes of conducting a review under **Section 15 B.** of the Pilot Working Agreement due to concerns the Company has regarding your mental health and whether you meet the standards required for a First Class Medical Certificate.

While Davis had signed this Section 15 letter as Delta's management representative authorizing the adverse employment action, he refused to tell Petitt what she had done to warrant removal from duty. March, 17, 2016, Petitt made multiple calls to ALPA attorney Rachel Samuda to discuss the next steps in the process without response. Samuda failed to respond to Petitt's calls for an entire month.

21.     Although Delta purportedly removed Petitt from active flight duty based on allegations that she was mentally unstable, Graham did not cancel Petitt's previously planned SMS presentation for Delta's divisional leaders. Accordingly, on April 27, 2016, Petitt traveled to Atlanta and made a lengthy presentation on SMS and aviation safety culture to a group of high-ranking divisional leaders. She addressed a number of issues related to Delta's lack of safety culture and preparation for the FAA's 2018 deadline to adopt SMS programs and she offered workable solutions. CEO Ed Bastian (Bastian) was not at the meeting, despite his being the accountable executive of SMS. John Laughter, the Senior Vice President of Corporate Security Safety and Compliance also did not attend the meeting despite Petitt's request for his presence, and despite Graham's later admonishments in court that he was the very person Petitt should have given the safety report to. After the meeting, Petitt mailed a copy of the presentation to Bastian, with a hand-written note addressing him as Ed consistent with common usage at the airline and also with Bastian's encouragement of Delta employees to refer to him by his first name.

That note ended up in her medical report and would become a reason for her mental health diagnosis as a result of her "undue familiarity" in addressing Bastian as "Ed."

22.     After her three-hour safety presentation, Faulkner interviewed Petitt on April 27, 2016 for the ostensible purpose of determining whether Delta would proceed with the psychiatric examination of Petitt. The supposed purpose of Faulkner's interviews with Petitt on April 27 and April 28 was to get "her side of the story."  Nevertheless, Faulkner proceeded with the psychiatric referral despite his determination that Petitt's deport was devoid of any indicator of a mental health issue (e.g., slurring of words, inappropriate speech, inappropriate dress, lack of personal hygiene, inappropriate statements). Moreover, the referral was made without prior review of Petitt's aeromedical records, personnel file, history of absenteeism or lateness, or sick leave usage. Nor did Faulkner make any effort to assess the relative credibility of Nabors' and Petitt's respective accounts of their interview, despite the fact that his medical practice requires him to engage in credibility assessments.  Faulkner nevertheless articulated no other basis for referring Petitt for a compulsory psychiatric examination other than Nabors' account, which he conceded could have been founded on a "misunderstanding" on Nabors' part.

23.     On April 19, 2016, Samuda finally reached out to Petitt regarding the grievance to pursue the reinstatement of her job, a month *after* she had been removed from duty. Samuda remarkably referred to Petitt's grievance as "non-disciplinary" regardless of the fact Petitt was being forced into a psychiatric evaluation with ALPA's knowledge of Graham's pre-mediation to an action that would leave Petitt unemployed, despite ALPA's knowledge that Graham stated he would use the psychiatric evaluation in response to Petitt bringing safety information forward.

24.     From April 19, 2016 to May 16, 2016, Petitt continued to query Samuda as to the

elements of the grievance process to save her job. Samuda was evasive and repeatedly, in lieu of providing direct answers to Petitt's questions, copied and pasted portions of the contract that Petitt had access to. Furthermore, Samuda continued to ignore any inquiries from Petitt regarding the Section 15 process. ALPA never provided Petitt any guidance with respect to the Section 15 process, such as the procedural steps, or that she would be required to take neuropsychological testing.

25.    Puckett selected Altman for the Company Medical Examiner (CME) for Petitt's Section 15 in a manner that violated the terms of the PWA. Puckett, admitted under oath that Altman was not paid for his March 17th participation, but instead his payment was rolled into his final bill that totaled $73,923.45, indicating he was employed on the March 17 date.

26.    Faulkner formally notified Altman of his appointment as Company Medical Examiner (CME), on April 28, 2016 at 11:09 a.m., even prior to commencing his second interview of Petitt at twelve noon the same day, and in breach of the contractual obligation under the PWA to discuss CME candidates with AMAS prior to the selection. Faulkner also made his selection prior to discussing Altman with ALPA Dr. Riccitello (Riccitello), Medical Advisory Service (AMAS), in violation of the PWA that required a discussion between AMAS and DHS prior to the selection of the CME.

27.    On May 4, 2016, Faulkner notified Petitt she was scheduled for neuropsychological testing on May 11, 2016. Petitt requested a delay in order to prepare for the testing process. Faulkner told her that it was impossible to train for the testing, and refused the delay. On this very date, Petitt contacted ALPA attorney, Gordon Rose (Rose), who advised her to take an unpaid leave of absence in lieu of the mandated neuropsychological testing. ALPA attorney Rose knew that if Petitt refused to submit to testing she would be in violation of the PWA,

and she would never return to duty at Delta Air Lines. Rose's advice was provided in a manner that was arbitrary because it was decisive and unreasoned, discriminatory because of unequal treatment between Petitt and other ALPA members who are male, and in bad faith because his advice was offered with an intentional act of omission that if she proceeded as directed, that she would be unable to maintain employment with Delta.

28.     On or before May 5, 2016, Faulkner advised Petitt that Riccitello understood why Delta was compelling her to submit to a compulsory psychiatric examination. Petitt telephoned Riccitello, on May 5, 2016, and asked if he could help her to understand why the compulsory psychiatric examination was warranted. Riccitello advised Petitt that it was because she had told someone that her mother had a copy of the Petitt safety report in her safe and if anything happened to Petitt, her mother would take it to the media. ALPA possessed knowledge that this Section 15 had nothing to do with mental health, and everything to do with Delta's retaliatory animus arising from Ms. Petitt's exposure of the carrier's safety lapses.

29.     Petitt was assigned to Altman in a manner that violated the terms of the PWA, without any objection from ALPA. Petitt queried Rose, asking him if knew anything about Altman. Rose stated he *did not*, and that Delta utilized many doctors.  Samuda stated she had no *personal knowledge* of Altman. Petitt later learned that Rose not only knew of Altman, but, with Samuda's knowledge, had made an effort on behalf of a male pilot, Captain Michael Protack, to ensure he was not subjected to Altman due to Altman's unethical and retaliatory behavior. Petitt later questioned Rose with respect to his false statements regarding knowledge of Altman and why Rose had failed to disclose Altman's history of retaliatory misconduct. Rose responded that if Petitt had known that information it wouldn't have mattered anyway. Rose and Samuda's discriminatory actions with unequal treatment between Petitt and other male members of ALPA, were in bad faith

because of their intentional act of omissions to withhold information. The very information they provided to Captain Michael and fought to protect him from Dr. Altman.

30.     On May 16, 2016 Petitt expressed her concerns to Samuda, and copied ALPA representative Crane that 1) the Delta-provided rationale for her removal from duty was in conflict with the position of Dr.  Kay, a clinical Associate Professor of Neurology at Georgetown, and developer of the neuropsychological test, 2) ALPA medical representative Riccitello had advised Petitt she was placed into psychological evaluation because Petitt provided her safety report to her mother for transmission to the media, 3) she had been warned in November and December 2015 that she was to be forced into a Section 15 evaluation process, 4) there was an inherent conflict between Delta's request that she go to Atlanta for a safety presentation with divisional leaders and parallel determination to compel her to submit to psychiatric examination, and 5) there was an inherent conflict in Delta's decision to allow her to retain access to the flight deck for a week, if the airline thought she had a mental health problem. Samuda ignored Petitt's questions and concerns.

31.     May 18, 2016, Petitt was subjected to neuropsychological testing at the Rehabilitation Institute of Washington.  The testing was conducted over seven hours with a 30-minute break. The technician stated that the tests administered that particular day were normally done in a two-day period, not one day as they had occurred, because there was too much information at once for the brain to process.  May 19, 2016 Petitt contacted Samuda and Rose with her concerns as to why the testing was conducted in a single day over seven hours when the standard approach was to conduct the testing over two days. May 20, 2016 Samuda relayed that AMAS advised "*they believed it was probably ok.*"

32.     Petitt had requested that Dr. Faulkner permit her a delay testing in order to prepare.

He denied this request. However, ALPA had knowledge that male pilot Captain Larry Troyer was provided the opportunity for training prior to his testing, and did not use set precedent on her behalf. Captain Larry Troyer had been removed from duty by his AME due to actual medical concerns and he subsequently failed his initial cognitive test. The following preparation enabled him to return to duty immediately.

33.     Petitt completed the neuropsychological testing successfully in that the results provided no indication of a disqualifying mental health problem.  However, these positive results were withheld from her over a period of eight months.  Moreover, despite the positive results of this testing, Delta still required Petitt to submit to an abusive and gender-biased psychiatric evaluation. ALPA made no effort to determine the results of her tests.

34.     Petitt filed an AIR 21 complaint with the Occupational Safety and Health Administration ("OSHA") on June 6, 2016: AIR21 2018-AIR-00041

35.     June 9, 2016, FAA Administrator Michael Huerta proclaimed that the general application of the psychological test that Petitt was subject to was ineffective and airline pilots would not be subject to taking them as a safety measure in response to the Germanwings event.

36.     Petitt met with Dr. Altman in Skokie Illinois, on three dates: 7/6/2016, 7/15/2016 and 9/14, 2016. Altman locked her in an extremely cold room alone with only him for six hours on the first day and asked her inappropriate and gender-biased questions such as if she had expressed her milk to feed her babies; a question concerning events over thirty years earlier. Petitt complained of this inappropriate line of questioning, and the conditions in which she was being subjected to, to both Samuda and Riccitello, and they made no effort to address her concerns and directed her to return to Altman. By contrast ALPA fought to keep the plaintiff's male co-worker, Captain Michael Protack,

15

from being subject to evaluation by Dr. Altman.

37.     On April 23, 2017, Petitt wrote to the ALPA National President, Tim Canoll, and copied 31 representatives, including ALPA National legal, in request of support, due to her local representatives and ALPA legal not assisting her, but also to communicate the need for ALPA to provide support more generally for pilot-members who engage in whistleblower actions relating to safety and compliance issues.    Petitt provided substantial supporting documentation. Nevertheless, nobody at the National ALPA level responded to Petitt's request for help. The current, 2020, National President, Joe DePete (DePete), was the Vice President at the time of this event and he, too, ignored Petitt's plea for help.

38.     July 11, 2016 Petitt filed grievance ATL 16-11 in which she alleged that Delta did not have reason to believe she belonged in a Section 15 and that her compulsory psychiatric examination was ordered for retaliatory purposes. Pursuant to the PWA, the initial grievance hearing was required to be in Petitt's base. Instead, Petitt was ordered to fly to Atlanta (on a two-day notice) on the last day of Delta's time limit, to have her grievance heard by Graham, the very person who had made the compulsory psychiatric examination decision that her grievance was challenging.  As referenced above, ALPA had prior knowledge that Graham had been planning to subject Petitt to a compulsory psychiatric examination for several months prior to her submission of her safety report and that he was the individual responsible for the retaliatory Section 15 decision that she was grieving.  Petitt voiced her concern to Samuda that Delta's scheduling directive for the grievance hearing violated the PWA, which provided that this meeting should be held in Seattle. Samuda advised Petitt that she had no choice:  she must attend the meeting in Atlanta with Graham or she would lose the grievance. Crane declined to represent Petitt at this grievance hearing, stating that he was unwilling to fly to Atlanta with the short notice

provided. ALPA representative Dave Rogers was present at the meeting, but made no effort to advocate in favor of Petitt's grievance by speaking or taking notes. Subsequently, an inaccurate account of the grievance meeting, created by Delta, was found in Petitt's medical report, without any counter-balancing record from ALPA. To Petitt's knowledge, this violation of the process has never been permitted by ALPA with respect to her male counterparts.

39.     On August 24, 2016, grievance 16-11 was denied by Graham, the same person who had made the Section 15 decision. ALPA had knowledge since 2015 that Graham had planned the Section 15 action against Petitt, took no action to communicate the content of the November 9, 2015 email to Petitt, and stood by and watched Graham become the judge and jury of his own premeditated retaliatory act, without objection.

40.     September 2016, Riccitello, of AMAS, advised Petitt to not disclose to the FAA that she had been ordered to submit to a company-ordered psychiatrist examination on her first class medical certificate application, and Crane concurred. Because such an omission would have constituted a violation of the law, Petitt did not follow the non-disclosure advice of AMAS and her ALPA representative. For both AMAS and the ALPA pilot representative, a thorough knowledge of the federal regulation mandating disclosure of relevant medical events such as a psychiatric examination is a qualification for their positions and, therefore, full knowledge of this FAA requirement on their part must be presumed. Petitt submitted her application with disclosure of the compulsory psychiatric examination and the FAA issued her first class medical.

41.     Delta canceled the next-step review of grievance ATL 16-11, originally scheduled for December 2016, due to the unavailability of Nabors. The next-step review of grievance ATL 16-11 was then rescheduled for June 21-22, 2017.

42.     On December 29, 2016,  Riccitello left Petitt a voice message in which he stated,

17

*"I don't think we're going to have any luck with regaining medical certification,"* and added:

> "But that is our next sort of step with this as far as medical certification goes, which is my
> primary function in assisting you here, is to try to get an independent evaluation that would
> very, very effectively counter Dr. Altman's conclusion of a bipolar spectrum disorder, and
> that's going to be tricky because Dr. Altman's sort of a big gun with the FAA. You'd have
> to convince the FAA that he's totally wrong, that you do not have any sort of bipolar
> spectrum disorder, and that would be a difficult situation. But I think I gave you Dr.
> Brousseaus' name and number. She's certainly a good person for you to talk to and explain
> your situation to, and she would probably be the best next step."

However, despite Riccitello's stated belief that Petitt would not regain medical certification and directed her accordingly, Petitt never lost her medical certification throughout the entire process. It was after Petitt conveyed her determination to pursue the standard renewal of her medical certification, contrary to Riccitello's advice that she abandon the effort, that he advised her to falsify her application document. To Petitt's knowledge, no male pilot has ever been advised to falsify records which would leave them in harms' way.

43.     In January, 2017, Petitt advised Riccitello she would use the Mayo Clinic as the Pilot Medical Examiner (PME). Riccitello attempted to convince Petitt not to utilize the Mayo Clinic Aerospace organization as the PME for the specific reason that *the FAA did not respect the Mayo like they did a private practice doctor*. Riccitello once again attempted to convince Petitt to see Dr. Brousseau as the PME, and stated Brousseau would read Altman's 366-page medical report for free.

44.     Petitt had scheduled her PME psychiatric examination by the Mayo Clinic for February 2017.  Prior to this February appointment, however, Petitt had an opportunity to work

with highly respected Forensic Psychiatrist Dr. Gitlow (Gitlow) as the PME in January. To expedite proceedings, she decided to utilize Gitlow. However, regardless of Riccitiello's statement that the FAA would prefer a private practice doctor over the Mayo Clinic, AMAS refused to provide Altman's report to Gitlow. Therefore, on January 6, 2017, Petitt emailed Gitlow the files directly. AMAS subsequently communicated to Delta that Petitt was utilizing Gitlow, and Puckett thereafter contacted Gitlow and retained his services with the condition that he would not work with Petitt.

45.     Petitt therefore retained her Mayo Clinic appointment for a PME examination and visited the clinic from 2/13/2017 to 2/15/2017. Once again, Petitt was due for her first class medical certificate renewal in February, therefore, on February 17, 2017, Dr. Altchuler from the Mayo Clinic notified Petitt's Aviation Medical Examiner (AME), Dr. Larry Greenblatt (Greenblatt), that Petitt was fit for duty, that Petitt exhibited no signs of bipolar disorder, and that a complete report would be forthcoming.

46.     During Petitt's medical evaluation, the following Monday, February 20, 2017, Greenblatt became apprehensive about issuing her medical certification. Greenbatt's apprehension did not arise from any concern for her fitness for duty, but rather, because he had been warned by a contact, retired FAA Certification Manager, Dr. Warren Silberman, that he should "*not support the airman any farther, that this was a timebomb with the Mayo Clinic and Dr. Altman*" and referred to Delta as *"the baddies"*.  Dr. Greenblatt reached out to Dr. Brett Wyrick (Wyrick), FAA Northwest Mountain Regional Flight Surgeon who then issued Petitt her medical certificate, based upon the Mayo Clinic's assessment.

47.     The PWA Section 15 process dictates that the company is not allowed to notify the FAA of any medical or psychiatric review of the pilot's condition until the review process has

been complete, including any examination by the appointed PME or subsequent examination by a Neutral Medical Examiner (NME) required by Section 15 in the event that the first two diagnoses – by the CME and PME – conflict. However, Faulkner DHS, with the agreement and prior authorization from Puckett, notified FAA medical representative Dr. Michael Berry of the on-going process. There is no record that this contractual violation has ever occurred for a male pilot. At this time, Petitt did not have certain knowledge that Delta representatives had authorized notification of the FAA of the ongoing Section 15 process, but assumed that such notification must have occurred based on the fact that the FAA had instructed Wyrick to open an investigation of the evaluation. Petitt requested Samuda to file a grievance alleging that Delta had violated the PWA mandate that Delta initiate no contact with the FAA until the entire Section 15 review process had been completed.  ALPA filed this Grievance, but not until *five months after* the  request on August 4, 2017 as Grievance 17-14. Petitt was later forced to withdraw this grievance to avoid a final and binding ruling, due to a statute of limitation exceedance as a result of ALPA's mis-management. To Petitt's knowledge, no male pilot has ever been subjected to ALPA losing a grievance due to statute of limitations for a grievance that was requested on the first date of knowledge, and expired due to ALPA's delays.

48.     The PWA contractual process requires that the Company Medical Examiner (CME) and Pilot Medical Examiner (PME) jointly determine the medical professional who will function as the Neutral Medical Examiner (NME). On March 16, 2017, Faulkner sent Petitt a release for Dr. Brousseau (Brousseau) to become the Neutral Medical Examiner (NME) *prior to* Altman discussing Brousseau with the Mayo Clinic. Altman ultimately offered Brousseau as the NME. Brousseau was the very doctor that Riccitello (ALPA) had also encouraged Petitt to utilize, and then later was promoted as Delta's candidate for NME.

49.     During the Section 15 process, ALPA Contract Administrator Hartley Phinney had communicated to Delta that Petitt was blocking the process for the selection of the NME, which incited Graham to threaten to make Petitt's removal from duty permanent, based on Ms. Petitt's supposed non-compliance with the Section 15 review process. Thus, ALPA's false statement resulted directly in Delta's threat of termination. To Petitt's knowledge, ALPA has never interfered in the Section 15 process with a male pilot by communicating false statements to management that would leave them unemployed.

50.     The Mayo Clinic, which had identified Delta's Section 15 determination as a political action, rather than a legitimate mental health review, had an ongoing disagreement with Altman as to who would best evaluate Petitt as the NME. Allegedly to assist in expediting the selection of the NME, Samuda and Riccitello encouraged Petitt to recommend ALPA Aeromedical Chairman Captain Mark Pinsky's (Pinsky) sister in the role of the NME to the Mayo Clinic. Samuda and Riccitello argued that Pinsky was the PAN Manager (Pilot Assistant Network) and his sister would rule in Petitt's favor. Petitt rejected these suggestions for the following reasons:

1. Any reputable doctor would rule in her favor, therefore the implication that Petitt needed extra help was disconcerting to her,

2. Petitt knew Pinsky, as they had started the PAN program together at NWA, and Petitt had dropped out of PAN due to his refusal to train PAN members to identify a potentially suicidal pilot; therefore he had potential animus toward her;

3. Employing a psychiatrist who is a family member of a pilot working at Delta would be a conflict of interest; and

4. This request would be in violation of the PWA. The contract requires that the PME and CME must select the NME.

21

51.     After Petitt had returned to duty, a concerned ALPA representative from another airline advised Petitt of a first-hand conversation with both Pinsky and his sister in which Pinsky's sister expressed support for Altman's bipolar diagnosis without ever having met Petitt. Thus, Samuda and Riccitello had promoted the violation of the Section 15 process by bypassing the NME selection process for the purpose of selecting an NME who was pre-determined to end Petitt's flying career.  Pinsky's discussion of Petitt's case with any pilots was unprofessional and violated the confidentiality obligations inherent in his position; a violation aggravated by the fact that Pinsky had not legitimate involvement in Petitt's case.

52.     On March 21, 2017, Petitt provided a letter of complaint to Dr. Quay Snyder, Catherine Cazorla, and Keith Martin, managing partners of AMAS regarding Riccitello's contractual violations and his apparent support of Delta's adverse action.

53.     On April 13, 2017, Delta Pilot Mutual Aid (DPMA) representative Zsaneta Grinnage denied Petitt's disability benefits, despite Petitt having paid into this program. This ALPA-provided program denied Petitt's application for benefits for the stated reason that she was fit for duty, despite being barred from flight duty by Delta for alleged mental health reasons. ALPA made no effort to support or assist Petitt to obtain her benefits. Male pilots who are fit for duty, but pending release have been allowed to utilize their medical benefits.

54.     June 5, 2017, Delta's newly assigned Counsel, Jeff Wall (Wall), cancelled the June 21-22, 2017 hearing for grievance 16-11 due to his unavailability. He requested that the grievance not be processed through the intermediate grievance steps and, instead, proceed directly to a five-person System Board, which is contractually empowered to render a final and binding decision.

55.     On June 15, 2017, Phinney provided Petitt with a list of four arbitrators Delta had selected. On behalf of Delta's counsel, Phinney advised Petitt of Delta's position that she could

select one of the four arbitrators proposed by Delta. This process of limiting potential arbitrators to four candidates pre-selected by ALPA was in violation of the contractual requirement of a strike-off process from a list of eleven arbitrator candidates and, upon information belief, is a process that has not been a process applied to similarly situated male pilots.

56.     A six-month calendar had been made available beginning June 1, identifying eleven arbitrators' dates of availability from June 2017 to November 2017. The four arbitrators' dates of availability that Phinney proffered on June 15, 2017 were not listed as available on the June 1, 2017 calendar. For example, Delta's list of arbitrators indicated that Carol Wittenberg was available on September 12-14, 2017; however, the six-month calendar identified Wittenberg availability only to be September 19-20.  Bonnie Weinstock's only dates of availability over the six-months were July 5-7, 2017, yet she was offered by Delta on October 23-25, 2017. Furthermore, one of the arbitrators selected, Josh Javits, was a former partner in the same law firm which currently represented Delta.

57.     On July 21, 2017 Petitt's counsel, Lee Seham (Seham), requested a strike-off process from a list of arbitrators from which the four arbitrators pre-selected by Delta would be removed due to Delta's *ex parte* contact with them. Wall failed to respond to Seham's letter. Thereafter, Delta and ALPA provided no further arbitration dates nor did they proffer an arbitrator selection strike-off process as required by the terms of the PWA. Indeed, ALPA discontinued any further communication with Petitt or her legal counsel regarding the processing of this grievance.

58.     On August 4, 2017, Petitt filed grievance 17-14, alleging additional contractual violations of the PWA's Section 15 process.

59.     On August 5, 2017, the Neutral Medical examiner (NME) Dr. Huff (Huff) cleared Petitt to return to duty pursuant to a medical evaluation in which he determined that, not only did

23

she not suffer from bipolar disorder, but that she was fit to fly. However, Faulkner directed Huff

to conduct a second evaluation outside the contractual requirements of the PWA Section 15

process.  ALPA made no objection to this further violation of the Section 15 process by Delta.

There has never been a male pilot who has faced two evaluations by the neutral examiner. Petitt

made her concerns regarding this further violation known to Samuda who, once again, supported

the company's decision.

60.     On August 26, 2017, pursuant to Delta's demands, Petitt met with Huff for a second

meeting at which time he told her she still had no disqualifying medical condition, was still not

bipolar, and was fit for duty. Petitt notified Samuda in an attempt to expedite her return to work;

however, Samuda informed Petitt she had to wait until Delta received a formal letter from Huff to

begin the process, despite Huff's email verification.

61.     On August 31, 2017, AMAS contacted Petitt requesting her to sign a release

permitting the release of her medical information to third parties. Phinney had prompted AMAS

to seek this release in furtherance of *his* direction to AMAS (August 1) to "brief the NME" on

applicable medical standards. However, this briefing was not Phinney's contractual responsibility,

nor that of AMAS, but contractually that of Faulkner. In addition, at this time, Petitt had already

advised AMAS that they were no longer involved in her case.

62.     On September 1, 2017 Petitt requested information from ALPA as to the process to

return to duty, pay concerns, and the lack of transparency regarding Altman. She copied 9 ALPA

representatives, including DePete. On September 5, 2017, Samuda responded to Petitt, but failed

to address any of Petitt's concerns.

63.     On September 7. 2017 Petitt queried Huff as to the status of her medical report. On

September 9, 2017, Huff advised Petitt that he had sent his medical report to Faulkner on

September 5, 2017, and he should have been in receipt of this report as of September 8, 2017.

64.     On September 9, 2017, Petitt left a message for Samuda advising her of her medical status and requesting support for her return to duty. Petitt called Samuda again on September 11 and on September 12, left messages requesting help to return to duty, and yet Samuda did not return her calls.

65.     On September 13, Samuda accepted Petitt's call and followed up with an email the same date advising Petitt that management was *not aware* of her return to duty, but management was having a conference call that afternoon. Samuda advised Petitt that she had left a voicemail for Puckett, inquiring as to Petitt's return to active status.

66.     On September 14, 2017 Petitt left a message for Samuda, inquiring with respect to her return to duty status. Samuda responded on September 15, 2017, and advised Petitt that the company would take appropriate steps to return Petitt to duty in light of the NME evaluation, and Faulkner would email Chief Pilot Support Center and,  Samuda would contact Petitt by end of day Monday, September 18, 2017. Samuda made no such contact.

67.     On September 19, 2017 Petitt emailed Samuda to check on her status because Samuda did not follow up on Monday September 18, 2017 as promised. Samuda replied on the 19th that she did not have the opportunity to follow through. Samuda advised Petitt that Delta and ALPA were involved in a System Board hearing that would continue through Thursday, September 21, 2017 and *as soon as she had a chance to speak to Chris Puckett about this matter*, she would. Petitt queried Samuda as to why this discussion had not occurred on Friday, September 15, 2017 when Samuda had met with Puckett. She did not respond.

68.     On September 20, 2019 Samuda told Petitt that she spoke with Graham and Puckett and they advised her the company was working on her return to duty.  Petitt was finally returned

25

to duty on September 24th at which time Delta backdated the computer system to reflect a September 5, 2019, return date.

69.     After reinstatement to duty on September 24, 2017, Petitt requested that her sick leave bank be replenished.  Rose, Samuda, and Phinney, adamantly argued against Petitt's right to have the sick bank replenished, contrary to the PWA contractual requirements. Phinney's interpretation of the contract was not only incorrect, but was gratuitously in support of the company. ALPA advised her that she would not recover her sick leave until after completion of training, which is the standard applicable to a Section 14, sick leave, not for Section 15. In fact, ALPA's position was less favorable to Petitt than that of Delta, which had submitted a position statement in response to Petitt's AIR 21 claim stating that Petitt would be made whole once she returned to work.  Petitt, submitted a letter to Delta copying her attorney, reminding the company of its position, and Delta management replenished her the sick leave. Despite Petitt receiving her sick leave, Phinney inexplicably stated that she could not use it.  ALPA's resistance to the make whole relief sought by Petitt deviated from its practices with respect to similarly situated male pilots.

70.     Petitt's sick leave was essential because her daughter was having major back surgery and Petitt needed the time to care for her. Had Delta and ALPA not delayed her return to duty, Petitt would have finished B777 training prior to her daughter's surgery and been able to use her seniority to bid a schedule providing her with the days she required to care for her daughter.

71.     On January 4, 2018, Samuda advised Petitt that a neutral arbitrator needed to be selected and a hearing date scheduled for Grievance 16-11, a date selected for 17-14 arbitration hearing, and that she was awaiting the company's response regarding the grievance related to the DHS' interference with the NME evaluation process in violation of Section 15 of the PWA.

72.     On January 5, 2018, Petitt advised Samuda, and copied eight ALPA representatives, including DePete and ALPA Master Executive Council (MEC) Chairman Bartels, that she would delay the hearing for 16-11 in the interest of safety, in that she had not flown for two years due to Delta's actions, and needed to focus on her flight training that was about to commence. Significantly, prior to Petitt's request, Delta had delayed this grievance a year earlier, then had its attorney Jeff Wall cancel the July schedule, bypassed the strike-off process, and then ignored Petitt's request for a subsequent strike-off. ALPA then remained silent with management for six months, until a time Petitt was about to begin B777 training. Petitt expressed her concerns with this sequence of events and ALPA's present time insistence to force an immediate hearing and selection of an arbitrator without a strike-off process. ALPA's hostile reaction to scheduling accommodations sought by Petitt deviated from its practices with respect to similarly situated male pilots.

73.     On January 10, 2018, Samuda advised Petitt that Arbitrator Carol Wittenberg (Wittenberg) had been selected from the parties' standing list of neutrals by utilizing the "alternate" strike-off method and she would preside over Petitt's Five Member System Board.  Wittenberg had been one of the four arbitrators selected by Delta Counsel and proffered by Phinney, that were rejected by Petitt and her legal counsel in July 2017 due to a lack of the strike-off process and Delta's *ex parte* contacts. Samuda was aware that Petitt was concerned with Wittenberg due to Wall's *ex parte* communications with the arbitrator.

74.     On January 23, 2018, Delta's counsel Benjamin Stone (Stone) advised the OSHA investigator, McDevitt (McDevitt), that a "neutral" arbitrator had been selected and that Delta requested Petitt's AIR 21 whistleblower case be deferred in order to have the issue of retaliation be determined in an arbitral hearing.

75.     On January 31, 2018, McDevitt advised Petitt that he had communicated to Delta that under OSHA rules, if this case were to be heard in the grievance process all parties would have to abide by OSHA rules versus the contractual requirements, which would include:

- Complainant will be afforded a meaningful role in the selection of a neutral arbitrator;

- The arbitrator will have the authority and discretion to allow both Complainant and Respondent to conduct meaningful discovery;

- The complainant may be represented by the attorney of her choosing throughout the arbitration process;

- The arbitrator will be permitted to award the following remedies that would be available under AIR21: reinstatement, back pay, compensatory damages, and reasonable attorneys' fees should Complainant prevail;

- Complainant will not bear the fees and costs associated with arbitration;

- Respondent will waive any argument that arbitration would be untimely; and

- Respondent will promptly forward a copy of the arbitrator's final written decision, including all findings of fact, to OSHA at the conclusion of the arbitration.

- At that time, OSHA will review the decision and findings of fact to determine whether the arbitrator's award should be given deference.

76.     On February 4, 2018, Petitt wrote to ALPA National Attorney Jim Johnson (Johnson) directly, requesting assistance. Johnson had been copied on all emails to Samuda regarding the Wittenberg issue. Petitt advised Johnson of her concern with respect to the selection of the arbitrator in a manner that violated the contractual requirement of a strike-off process. Petitt forwarded the July 14, 2017 email to Johnson that stated "*I am requesting an alternate strike*

*procedure be established, with the prior removal of the arbitrators previously contacted by Jeff Wall: Weinstrock, Javits, Nicolau, and Wittenberg.  I would like ALPA to make this demand based upon these arbitrators have been tainted by the ex parte contact with Wall."*

77.    February 7, 2018 Samuda responded on behalf of Johnson and advised Petitt that ALPA did not agree that those arbitrators were tainted by Wall's *ex parte* communications and refused to consider the selection of an alternate arbitrator.  However, ALPA has a history of changing arbitrators when a male pilot objects as illustrated by the objection by Captain Protack to the selection of Josh Javits for a hearing scheduled on December 4, 2018, which resulted in Rose arranging for the removal of Arbitrator Javits and his replacement with Arbitrator Marlene Gold. ALPA made an accommodation for a male pilot, but not for Petitt.

78.    On February 8, 2018, McDevitt advised Petitt that the OSHA investigation was on hold because he was waiting for Delta to sign the agreement to abide by the OSHA rules prior to deferring the OSHA investigation. On March 23, 2018, McDevitt advised Petitt that Delta had refused to sign the agreement and he would proceed with the OSHA investigation. This delayed Petitt's AIR 21 proceedings an additional 3 months.

79.    From January 10, 2018 to March 30, 2018, during the time period of Petitt's B777 flight training, she had multiple discussions via email and on the telephone, pleading with ALPA to demand adherence to OSHA arbitration due process standards consistent with the obligations applicable to Delta if it sought to have OSHA defer to arbitral proceedings.  Nevertheless, ALPA refused to return to the strike-off process despite the fact that Petitt provided Samuda the OSHA manual and explained the arbitral process standards described therein.

80.    Despite the continuing disputes with ALPA and the union's refusal to address her concerns, on March 3, 2018 Petitt completed her B777 type-rating.

29

81.    On March 5, 2018 Samuda advised Petitt that Wittenberg's dates of availability were September 26-28; October 30-31; and November 7-8. Regardless of Samuda's proclamation in January of the necessity for urgency to get Ms. Petitt's case "off the books," Wittenberg's dates of availability were months out, which confirmed that the purported goal of expending Ms. Petitt's case could more readily be accomplished with a different arbitrator.   Petitt spoke to an ALPA Los Angeles representative explaining her concerns regarding the supposed urgency of processing Petitt's case followed by the lack of availability of Wittenberg.  He agreed that Samuda's actions were in conflict with her stated rationale.

82.    Based upon the questions raised concerning the incongruity of the purported urgency of processing Petitt's grievance through arbitration and the delay in dates, on March 26, 2018, Samuda advised Petitt that Wittenberg had new dates of availability on June 26-28 and July 11-13. She directed Petitt to select one. In response, Petitt reiterated the OSHA requirements and directed her to page 94 of the 290 page OSHA manual. On March 27, 2018, Samuda threatened Petitt that if she did not pick a date, Samuda would select one, advising that the arbitral process was governed by the Railway Labor Act (RLA), and denied the applicability of the due process standards contained in the OSHA manual. Petitt countered that ALPA had the responsibility to represent her, and in doing so should request Delta to adhere to the standards they enacted by requesting the OSHA investigator to drop the investigation in order for Delta to proceed in the arbitral process, or at the very least ALPA should provide Petitt the same opportunity as her male peers with reselection of an arbitrator.  Petitt conveyed to Samuda that the administrative law judge (ALJ) who had jurisdiction over her AIR 21 case had ruled against RLA preemption, and Samuda said that did not matter, but provided no rationale for her position. Petitt then communicated to Samuda that her attorney was not available on June 26-28, and Petitt was not available on July 11-

13 due to her 37th Wedding anniversary.

83.     On March 27, 2018, Petitt reiterated to Samuda a detailed rationale as to why
Wittenberg was unacceptable, with a dozen supporting points. On March 28, 2018, Samuda
ignored Petitt's concerns, and demanded that the dates for an arbitral hearing with Wittenberg be
selected by March 30, 2018. Petitt responded that none of the dates offered would work for either
Petitt or her counsel. ALPA's demand that Ms. Petitt select from the limited dates proffered for a
hearing to be presided over by Wittenberg occurred despite the fact that ALPA had enabled Delta
to reschedule the hearing on two prior occasions and delay the processing of the grievance for over
a year based upon Delta's availability.

84.     On March 30, 2018 Samuda advised that the arbitration was selected for July 11-
13, over her 37th wedding anniversary, with Wittenberg. Petitt responded with a lengthy email to
Samuda regarding ALPA's complicit behavior with the arbitrator selection and that she would not
be available on those dates and requested that ALPA postpone the hearing. Samuda refused.

85.     The existence of an improper relationship between Delta and Wittenberg that would
preclude a fair arbitration hearing is further evidenced by Delta's proposal a year later that Petitt
accept mediation conducted by Wittenberg in lieu of an AIR 21 trial.

86.     April 13, 2018 Petitt advised her LEC representatives that she was withdrawing
grievance 16-11. Instead of proceeding to an arbitration, Petitt decided to assert her claim regarding
the improper initiation of the Section 15 referral via the AIR 21 process for the primary reason that
she was not being represented by ALPA. The Wendell H. Ford Aviation Investment and
Reform Act for the 21st Century (AIR 21) was enacted to not place passenger safety in
the hands of a private contractual grievance process for the very reason of process
irregularities, lack of discovery, and limited remedial authority that prevailed in the

arbitral process, in this case jointly controlled by Delta and ALPA.

87.     May 7, 2018 Petitt requested that Ms. Betty Ginsberg (Ginsberg), ALPA National Attorney, conduct an investigation with respect to 23 points of concern relating to AMAS improprieties, and Samuda's and Rose's lack of representation. On May 24, 2018 Ginsberg denied any wrongdoing by ALPA attorneys or associated representatives, and on May 25, 2019, she refused to provide any notes, written responses to the multiple questions asked by Petitt, or provide any indication that an investigation had even occurred prior to her determination that no misconduct had occurred.

88.     ALPA transmitted to Delta, Petitt's email to Ginsberg requesting Ginsberg's assistance.   Delta thereafter utilized the information provided by ALPA against Petitt in the AIR 21 case. Petitt was also denied participation by ALPA in the CIRP committee (Critical Incident Response Program) and was refused requisite training because she had placed the investigatory request with Ginsberg.

89.     In its July 13, 2018 letter, OSHA, acting on behalf of the Secretary, found that the parties were covered under the AIR 21, but that there was insufficient evidence to establish reasonable cause that a violation occurred. Accordingly, OSHA dismissed the complaint.

90.     July 20, 2018 Petitt filed grievance 18-13 alleging that Faulkner improperly communicated to Neutral Medical Examiner (NME).

91.     On August 1, 2018, Petitt objected to OSHA's findings and, pursuant to the procedures established by the AIR 21 statute, requested a formal *de novo* hearing before the Office of Administrative Law Judges ("OALJ"). ALJ Morris issued a Notice of Hearing and Pre-Hearing Order on September 27, 2018, and set the hearing for March

25-29, 2019 in the Seattle, Washington area. As part of this Order, the Tribunal required Petitt to file a Pleading Complaint.

92.     On October 18, 2018, Petitt filed her Pleading Complaint. On November 20, 2018, Delta filed its answer to Petitt's Pleading Complaint and included 15 affirmative defenses.

93.     On December 4, 2018, Petitt filed a Motion for Summary Decision on the issue of Adverse Action. On December 26, 2018, Delta filed its opposition to Petitt's motion.

94.     On January 12, 2019 Petitt successfully defended her doctoral dissertation, validating her concerns with safety culture, safety management systems, and pilot training, and addressing the DOT Office of Inspector General's concerns as to why pilots were not capable of hand flying their aircraft, as a result of negative safety culture, lack of SMS, and resultant inadequate pilot training.

95.     On January 16, 2019, Petitt filed a Motion for Summary Decision with respect to all issues. On February 6, 2019, Delta filed its response to Petitt's motion.

96.     On February 14, 2019, the parties submitted a joint stipulation on the issue of protected activity, specifically:

> [Delta] stipulates that Petitt's January 28, 2016 report
>
> (Petitt's "report") – that raised issues concerning: pilot fatigue, pilot training, pilot training record, and [Delta's] Safety Management Systems (SMS) programs – qualifies as protected conduct under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR 21). [Delta] further stipulates that it will not challenge that Petitt engaged in protected

conduct when she submitted her report to [Delta] on January 28, 2016, when she offered to forward her report and eventually did forward it to other [Delta] executives including Ed Bastian, when she discussed her report with Steven Dickson and Jim Graham on January 28, 2016

and thereafter, and when she gave a presentation to [Delta] executives on April 27, 2016 concerning Petitt's report, [Delta] did not waive any defenses to the Complaint filed by Petitt.

97.    On February 5, 2019 Petitt filed Grievance 19-05: outlining 12 contractual violations related to the Section 15 process applied to her, based on information she had obtained via the AIR 21 discovery process.

98.    On February 12, 2019, Delta filed a Motion for Summary Decision arguing the Railway Labor Act precluded Petitt's claims. On February 20, 2019, Petitt filed a response to this motion.

99.    On February 21, 2019, the Tribunal issued an Order denying Petitt's Motion for Summary Decision. However, in this Order, the Tribunal found the parties subject to the Act and accepted the parties' stipulation concerning protected activity and that Delta's order compelling Petitt to submit to a Section 15 psychiatric examination constituted an adverse action under AIR 21.

100.    On February 26, 2019, Delta filed a Motion for leave to submit a reply brief. On February 27, 2019, the Tribunal issued an Order denying Delta's request to file a response to Petitt's reply to its Motion for Summary Decision.

101.    On March 1, 2019, after addressing in detail whether the Railway Labor Act preempts application of AIR 21, the Tribunal issued an Order denying Delta's Motion for

Summary Decision. The Tribunal held a trial on the merits in this matter in Des Moines, Washington from March 25 to March 29, 2019, April 25, 2019 and from April 29 to May 1, 2019. Petitt and Delta's representatives were present during all of these proceedings.

102.   In its opening statement at the AIR 21 proceeding, Delta conceded that Petitt engaged in protected activity when she made her report to Graham and Dickson on January 28, 2016.

103.   On May 15, 2019 ALPA counsel Jeff Loesel (Loesel) advised Petitt that the company would not extend the deadline to appeal Delta's denial of Grievance No. 17-14, and that Delta's denial of the grievance would be considered final and binding. He further advised that grievances 18-13 and 19-05 would be heard on October 15, 2019. On May 22, 2019, Petitt disagreed with ALPA's position regarding the finality of Delta's denial of grievance 17-14, explaining that the claims made in this grievance had been subsumed by grievance 19-05, a more comprehensive grievance that benefited from the additional information obtained via the AIR 21 discovery process. Petitt explained her position in numerous emails transmitted between Petitt and Loesel from May 2019 to October 2019.

104.   On June 3, 2019 Petitt officially withdrew Grievance No 17-14, *without prejudice*, as it is had been subsumed by Grievance No 19-05, which was filed upon discovery of additional information related to the contract violations alleged in Grievance No 17-14.

105.   On June 4,  2019, the Senate Commerce, Science and Transportation Committee delayed Dickson's nomination to become the FAA Administrator due to his involvement in the decision to compel Petitt to submit to psychiatric examination after the submission of her safety report, and his failure to disclose his involvement as a deposed witness in Petitt's AIR 21 litigation in response to a questionnaire from the Senate Committee.

106.    On June 5, 2019, in the immediate aftermath of widespread media coverage of Dickson's failure to disclose his involvement in the Petitt matter to the Senate Committee, ALPA MEC Chairman Captain Ryan Schnitzler (Schnitzler) personally telephoned Petitt and asked her what ALPA could do to help, irrespective of the fact that ALPA had had direct knowledge of the ongoing events for years.  While Schnitzler was not the MEC Chairman at the time of the Section 15 action, he did have knowledge of Petitt's Section 15 events. Petitt expressed to Schnitzler her concerns related to Dickson and ALPA's lack of support and complicit behavior throughout the Delta-initiated Section 15 process. Petitt stated she would like her dues reimbursed for lack of support, but would write to him with how ALPA could further assist her.

107.    On June 6, 2019, Petitt emailed Schnitzler and provided him a further response as to how ALPA could help. She conveyed that ALPA should withdraw its support of Dickson's nomination for the FAA Administrator position based on a number of factors including his inclination to take retaliatory action against a pilot who reported non-compliance with federal aviation standards. On June 6, 2019 Los Angeles Captain Brian Kolbus (Kolbus), who had been copied on the Schnitzler email, responded in support of the idea to not support Dickson. Schnitzler made no response.

108.    On June 11, 2019 Petitt spoke at Open Mic at an ALPA MEC meeting addressing the events that had transpired relating to her Section 15 process and the involvement therein of Dickson. Petitt spoke to Schnitlzer at this meeting and he conveyed ALPA's concern that if Dickson were to be appointed to the FAA Administrator despite opposition from ALPA, that Dickson as the FAA administrator would retaliate against ALPA; therefore, ALPA would not withdraw its endorsement of him. During this discussion Petitt explained her concerns with Ginsberg not conducting an investigation concerning ALPA's overt mishandling of her case.

Schnitlzer requested that Petitt forward to him an outline of the events that occurred and her communications with Ms. Ginsberg.

109.    ALPA possessed knowledge of numerous safety violations countenanced by Dickson, lack of FAA oversight of Delta operations, and that Dickson had the propensity to retaliate against Delta pilots reporting safety concerns. However, ALPA made no effort in the interest of safety to oppose Dickson's nomination, despite ALPA bylaws, Section 2, subpart C, "If the Federal Aviation Administration fails properly to carry out its certification obligations, the President shall promptly call a Board of Directors meeting to initiate protest action including suspension of service." Nor did ALPA make any effort at a local level to promote and support Petitt, or the many safety concerns she had brought forward.

110.    On June 12, 2019, Petitt forwarded to Schnitzler the Ginsberg email, and an outline of events related to the Section 15 process applied to Petitt.

111.    On June 29, 2019  Petitt wrote to Schnitzler, once again, requesting that ALPA withdraw its support for Dickson's nomination to the position of FAA Administrator. Schnitzler did not respond until July 11, 2019, and even then limited his response to a statement that ALPA would remain neutral with respect to the Dickson nomination process. Schnitzler provided no response to Ms. Petitt's concerns with respect to Delta's abuse of the Section 15 process or ALPA's failure to support her with respect to the contract violations she had raised.

112.    On July 6, 2019, Petitt requested ALPA's assistance in responding to the false statements that Delta was placing into the news regarding her, to the effect that her behavior raised questions about her fitness to fly.  ALPA provided no assistance or response to Delta's false statements, which continue to induce harm.  To Petitt's knowledge she is being treated differently from other employees in that Delta's policies stipulate against these type of social media

interactions, and she has no knowledge of a male pilot facing the same public humiliation.

113.    On July 10, 2019, Delta Manager of Sales Development in New York wrote an offensive opinion on a popular aviation site, in violation of Delta's corporate policies that dictate to not cause harm to fellow employees, and mandate truth, honesty and integrity.

114.    Petitt had repeatedly requested Delta and ALPA to investigate Graham. Finally, on July 11, 2019, Schnitzler requested from Delta an independent investigation into Graham in that the depositions from her AIR 21 identified that Delta Flight Operations engaged in a number of actions which suggest the Company may have acted against a Delta pilot for reporting safety-related concerns. In his request, Schnitzler stated, "*Regardless of the merit of those safety concerns*, it is entirely unacceptable."

115.    On August 3, 2019, Schnitzler forwarded to Petitt a letter from Wall stating that Delta would not investigate. ALPA did not pursue the issue of an independent investigation of Graham after the Wall denial.

116.    August 3, 2019, Petitt attempted to file an ethics and compliance complaint on the Delta hotline regarding Graham's violation of company policies and ethical compliance.

117.    August 14, 2019, Attorney and HR representative, Seppings telephoned to schedule a meeting regarding Petitt's August 3, 2019 hotline complaint. Seppings requested a meeting in a hotel lobby in Atlanta, and denied Petitt the right to have any union representation. English was not the intake officer's first language and the officer could not comprehend many of Petitt's statements. Nevertheless, Seppings would not allow Petitt to correct the complaint to ensure accuracy.

118.    On August 22, 2019, Seppings directed Petitt to respond to a series of

irrelevant questions that were not pertinent to the issues raised by Petitt in her complaint. Despite Petitt's repeated requests, Seppings refused to read the deposition and trial testimony that dispositively established both perjury and company violations committed by Delta management employees. On August 23, 2019, in response to Seppings indication that Petitt's hotline complaint was duplicative of Petitt's AIR 21 allegations, Petitt advised Seppings that the AIR 21 proceeding focused on Delta's corporate liability arising from the motivation underlying the Section 15 referral, whereas the hotline complaint concerned the misconduct of individual management employments including their violation of corporate policies. On August 28, 2019, Petitt provided a litany examples of sworn deposition and trial testimony identifying Graham's perjury with specific page references to the relevant transcripts. Seppings refused to examine the testimony or give any consideration to whether a Delta management employee's false testimony under oath constitutes a violation of any Delta policy.

119.    Upon further review of trial transcripts, Petitt learned that Seppings had also been involved in the adverse action taken against her regarding the retaliatory mental health evaluation, and Petitt requested that Seppings recuse herself from any further involvement in the internal Delta investigation prompted by Petitt's hotline complaint. Seppings refused and closed the case without an investigation. ALPA representatives had been copied on Seppings' response, but nobody within ALPA responded.

120.    On October 14, 2019, prior to the grievance hearing for grievances 18-13 and 19-05, pursuant to a procedural mandate of the PWA, Delta provided documents the carrier would use at the hearing. Not only did Delta supply documents from the AIR 21 hearing, but they also provided a binder of emails that were supposed to have been subject

to an attorney client privilege between Petit and ALPA's legal representatives. ALPA legal counsel Loesel agreed with Petitt that these communications should have been treated as privileged, but apparently an ALPA representative had forwarded the communications to Delta. Upon information and belief, ALPA has never engaged in such a betrayal of attorney-client privilege between ALPA counsel and a member when dealing with similarly situated male pilots.

121.   On October 15, 2019, grievances 18-13 and 19-05 were scheduled to be heard, however, Arbitrator Wallin (Wallin) did not allow evidence concerning the merits of the two grievances to be presented due to "arbitrability" issues related to whether the grievances had been filed and/or appealed in a timely manner. During opening statements, Delta counsel stridently asserted to Wallin that this was *"not a proceeding in which the Association and Delta are necessarily opposing parties."*  He stated that ALPA was hostile to Petitt because she had *"repeatedly criticized, and I would suggest even defamed representatives of the Association …."* ALPA's counsel made no response to Delta's representation that the union sided with the Respondent against Petitt.  Consistent with the PWA, Wallin was jointly selected by and *compensated by* Delta and ALPA.  As typical of Railway Labor Act arbitrations, and as reflected by the caption of the Wallin decision, Delta and ALPA were the parties to the action.

122.   During the October 15, 2019,  Grievance hearing, Delta's counsel pointed out multiple procedural errors in executions of the grievance process and alleged that they reflected Petitt's "manipulations" of the process. ALPA sat silently during these statements, despite the fact that any irregularities in the arbitral process were attributable to Delta and/or ALPA and not Petitt. ALPA controlled the filing of all grievances and timing, despite Petitt's multiple follow-up emails to ensure they were filed in a timely manner.  ALPA's lack of advocacy throughout the grievance

process was in contrast to the support provide to similarly situated male pilots.

123.    On December 11, 2019, Emilio Marcos (Marcos), Contract Administration, acknowledged Petitt's request to file a grievance regarding the October 15, 2019 hearing based on the fact that Delta counsel violated the American Bar Association's code of ethics by testifying concerning Petitt's actions and character thereby improperly influencing the arbitrator. On December 16, 2019, Captain Marcos advised that he was in full support of Petitt's grievance and apologized for the derogatory statements that he himself had made regarding Petitt to a third party.

124.    On January 17, 2020, Petitt filed a second complaint on the ethics and compliance hotline requesting an investigation of all the individuals involved in violation of Delta's Rules of the Road and Ethical Compliance violations that had been identified during the AIR 21 trial. This time, it took three calls to find a representative who would allow Petitt to dictate her complaint.

125.    On January 24, 2020, Petitt met with Delta Regional Director Captain Mike Levis (Levis), Chief Pilot Captain Eckert, and ALPA representative Mark Young (Young), regarding Grievance 20-05, whereas *Section 19* A. 2. requires "a neutral member" of the Five Member System Board "to decide a specific dispute."  The "neutrality" of Arbitrator Gerald E. Wallin was compromised when Delta's legal counsel, Jeffrey D. Wall, made his opening statement on October 15, 2019 asserting, *inter alia*, that both Delta and ALPA opposed Petitt's grievance. Levis denied the resolution of 20-05 and gave Petitt a verbal to proceed with the grievance. During this meeting, Petitt also provided Levis with a formal ethics and compliance complaint similar to what she had provided on the hotline on January 17, 2020.

126.    On January 24, 2020, shortly after the meeting, Petitt telephoned Marcos and advised him that Levis provided the go ahead to file the grievance. Marcos advised Petitt to contact Samuda and have her write up the grievance, as he would be out of town the first of the week.

Petitt emailed Samuda that evening on January 24, 2020, advised her of Marcos request, and Petitt also provided an outline of the written grievance to be filed.

127.   On January 27, 2020, Samuda communicated to Petitt that Marcos was on vacation and that Petitt must wait until his return.

128.   January 27, 2020, Petitt provided Levis with a recap of her meeting with him on January 24 and she copied 8 ALPA representatives.

129.   On February 5, 2020, Marcos emailed Petitt advising her of a change of heart and that he was now not supporting grievance 20-05. Marcos requested that Petitt telephone if she had any additional evidence for consideration. Petitt called Marcos and he stated that this removal of support was pursuant to the advice of Loesel, the same attorney who had remained silent during the October 15, 2019 hearing when Delta counsel had assert that ALPA and Delta jointly opposed Petitt's grievance. Petitt provided the additional evidence that Marcos had requested for reconsideration.

130.   On February 6, 2020 Petitt spoke with Loesel who stated he never communicated with Marcos regarding the issue of not supporting grievance 20-05. However, Loesel expressed his concerns with Petitt that if she were to win grievance 20-05 it could tie ALPA's hands with future cases with respect to ALPA's opening statements, in that ALPA itself may be challenged for violating ethical standards. Petitt questioned Loesel as to the status of the ruling. Loesel responded that there was nothing to report.

131.   On February 7, 2020 Petitt emailed Marcos and copied 13 ALPA representatives, communicating that she had spoken to Loesel and relayed his denial of speaking with Marcos. Petitt had given up her vacation to meet with Levis based upon Marco's confirmation of ALPA's support, and had provided substantial documentation as to the reconsideration.

132.    On February 8, 2020 Marcos stated there was nothing to reconsider and that his "team" made the decision. When asked who was on that team, Marco's initially stated he refused to tell Petitt, and then told her he would make up fake names. He finally said there was not a team, that he himself pulled the plug on this grievance. Petitt responded that she would be submitting the grievance, and copied 12 union representatives.

133.    On February, 11, 2020, Levis assured Petitt that he had forwarded her ethics and compliance complaint to the correct individuals and he would follow through. However, he never followed through.

134.    On February 24, 2020, Petitt reported to Delta HR representative Amy Bondurant (Bondurant) that she had filed the ethics and compliance complaint, and followed up with Levis on January 24, 2020. Petitt copied four ALPA representatives; however, nobody responded, not even Bondurant.

135.    On February 25, 2020, Delta Legal Counsel, Ira Rosenstein, communicated to Petitt that Delta refused to investigate her allegations and she was not allowed to speak to management.

136.    On February 26, 2020, Petitt reported to Levis her concern that Graham, the person who retaliated against Petitt for reporting safety concerns was promoted to Senior Vice President of Corporate Safety Security Compliance (CSSC), which she believed to be in violation of 14 CFR 119.64 d (3). Delta also promoted John Laughter (Laughter) to SVP of Flight Operations position, regardless of the fact that he did not hold an ATP and did not possess the requisite knowledge of flight operations and training requirements as deemed necessary by the FAA. Petitt copied her Seattle union representatives; however, nobody from ALPA responded.

137.    On February 28, 2020 Petitt followed up with Levis regarding her concerns with Delta's lack of follow-through on the ethics and compliance complaint, and copied Bondurant, and

8 ALPA representatives, attaching supporting documentation.

138.    On March 3, 2020, Delta filed a Motion to Admit New Evidence of the Arbitration Award and Motion for Brief Stay of Proceedings. Attached to that motion was a System Board of Adjustment (SBA) opinion and order dated January 27, 2020 and, contrary to standard practice, was signed by only the company representatives and the Arbitrator. Delta claimed the "newly issued award" rejected Petitt's theory that Delta's initiation of the Section 15 process was in retaliation for her reporting alleged safety issues.

139.    On March 3, 2020, Petitt contacted Marcos to advise him that she was in receipt of a ruling from Wallin, that had been issued on January 27, 2020. On March 4, 2020, Marcos advised Petitt that he was not in receipt of a "final decision." However, Loesel subsequently advised Petitt that ALPA was in receipt of the Wallin ruling as early as January 23, 2020, and that the ALPA System Board representatives simply had not signed the decision.

140.    Multiple communications regarding an official ruling ensued between Petitt and ALPA. Petitt attempted to obtain a ruling dated on the date of the ALPA signing. Marcos assured Petitt he would expedite this process. However, not only was the signing by ALPA representatives not conducted expeditiously, but the ALPA representatives back-dated their signatures to that of January 27, 2020, regardless of the fact that the ALPA representatives signed the decision on or about March 16, 2020.

141.    On March 9, 2020, Petitt met in Seattle with Levis, Eckert, and Young, concerning Grievance ATL 20-05. Levis admitted that the grievance 20-05 requested simply to have Grievances 18-13 and 19-05 heard. Levis agreed that the contractual violations

in Grievances 18-13 and 19-05 were equally as essential to safety as standard operating procedures were to the safety of flight. He agreed with Petitt, and admitted during this meeting that, despite the contractual requirement that Levis was to make the decision, Delta's attorneys would decide or his career would be over. Young never pursued this violation of the contractual obligation for Levis to make the decision, despite his admissions at that meeting.

142.    On March 10, 2020, Petitt followed up with a meeting recap to Levis and copied 4 ALPA representatives and ALPA National legal.

143.    On March 10, 2020, Petitt responded to the Motion, opposing the admission of the Arbitration Award as "new" evidence in the AIR 21 proceeding. As part of Petitt's response, she included (among other documents) the October 15, 2019 transcript of the proceedings before Wallin.

144.    On March 10, 2020, Petitt reported to Senior Executive Vice President of Flight Operations, John Laughter, serious ongoing safety concerns regarding the teaching of incorrect crosswind limitations on the B777 and B757 aircraft, exceeding Boeing's aircraft flight manual (AFM). Petitt copied 4 Delta training managers, and 9 ALPA representatives. Nobody at ALPA responded to this email, despite the failure in training and safety implications.

145.    On March, 30, 2020, Petitt filed an EEOC complaint against Delta based on lack of union representation based on her sex (female) and retaliation for participation in a protected activity, in violation of Title VII of the Civil Rights Act of 1964.

146.    On or about April 6, 2020, Petitt filed an EEOC complaint against Delta due to the carrier's ongoing retaliation and Delta's refusal to investigate Graham, Davis, Puckett, Nabors,

Seppings, Faulkner and Taylor.

147.    On April 14, 2020, the Tribunal issued an order granting Delta's request to admit new evidence, to include both the January 27, 2020 SBA decision by Wallin and the October 15, 2019, transcript of the SBA proceedings, into the record for the limited purpose of determining whether collateral estoppel should apply to the AIR 21 case with respect to issues allegedly determined by the January 27, 2020 SBA decision.

148.    On April 15, 2020, Petitt reported to Laughter that multiple individuals in flight operations management positions, HR, and Delta's legal department, had intentionally violated safety protocol designed to protect the traveling public by company policies that are the foundation of Delta's SMS program, and therefore a violation of federal standards, and made a request for an investigation and provided supporting documentation including: Grievances 19-05, 18-13, 20-05, Denial of 20-05, and her EEOC and Ethics Compliance Complaints.

149.    On April 17, 2020, Petitt reported to Laughter concerning Delta's actions constituting a further violation of company policy by refusing to investigate, respond to, or correct Delta management's ethical and policy violations. Petitt copied Senior Delta executives to include the CEO Ed Bastian and SVP HR, Joanne Smith, and 8 ALPA representatives. Nobody from ALPA responded.

150.    On May 4, 2020, Delta Managing Director Flying Operations Captain Larry Cochran (Cochran) responded to Petitt's April 15th and 17th emails stating that an investigation had been conducted and had been communicated to Petitt. To Petitt's knowledge, there was no record of any investigation nor had the scope or conclusion of any such investigation ever been communicated to her.

151.    On May 5, 2020, Petitt responded to Cochran, copying the CEO, SVP HR Smith,

SVP Laughter, and  8 ALPA representatives and explained that he had been misinformed in that an investigation had never been conducted as confirmed by the fact that Petitt was never interviewed, and that, if an investigation had in fact been conducted, the individuals would no longer be employed with Delta due to their gross violations of company policy. Nobody at ALPA contacted Petitt as would have been the case for a similarly situated male pilot.

152.    On May 11, 2020, Delta submitted into evidence the transcript of the October 15, 2019 arbitration and January 27, 2020 SBA decision. Delta also submitted into evidence, despite the record being closed, Petitt's April, 2020, EEOC complaint in violation of Title VII. Delta engage in retaliatory action by referring to her EEOC charge in a disparaging manner and attempting to use that charge as evidence against her in her AIR 21 proceeding.

153.    On May 21, 2020, Petitt filed her opposition to Delta's Motion to apply collateral estoppel.  But for the Wallin decision, cost and expense associated with this opposition would not have been incurred.

<u>**Most Recent Violations of Gender Discrimination and**</u>

<u>**Violations of Duty of Fair Representation**</u>

154.    As referenced above, during the October 15, 2019 attempt at a hearing for Grievances 18-13 and 19-05, Delta counsel stridently asserted to Arbitrator Wallin that this was "not a proceeding in which the Association and Delta are necessarily opposing parties."  He stated that ALPA was hostile to Petitt because she had "repeatedly criticized, and I would suggest even defamed representatives of the Association …."  ALPA's counsel made no response to Delta's representation that the union sided with the Respondent.  Consistent with the PWA, Wallin was

jointly selected by and *compensated by* Delta and ALPA.   As typical of Railway Labor Act arbitrations, and as reflected by the caption of the Wallin decision, Delta and ALPA were the parties to the action.

155.   On March 3, 2020, Petitt learned of a January 23, 2020 ruling.  This ruling was signed on March 16, 2020 by ALPA, however the ALPA System Board representatives backdated their signatures to make the ruling effective on January 27, 2020.

156.   In the January 27, 2020 ruling, Wallin issued a decision finding the two grievances filed by Petitt  that had been submitted to the SBA (ATL 18-13 and 19-05) to be untimely. However, neither of these two grievances before him addressed the propriety of the initiation of the Section 15 mental health evaluation process.  Yet, the Wallin decision included dictum in which he characterized the 2016 Graham decision of 16-11 as final and binding with respect to the issue of the motive underlying Delta's initiation of the Section 15 process— an issue that was not before Wallin.

157.   The ALPA representatives of the executive board were sitting at the table on October 15, 2019 when Loesel emphasized Petitt's concerns that the proceedings must not touch the AIR 21 complaint in any manner. Delta counsel and Wallin both agreed any decision regarding the pending grievances would not interfere the AIR 21 proceeding. Therefore, ALPA's executive board knew the AIR 21 elements were not to be addressed, as did Loesel, and they were obligated as a system board members and as ALPA representatives to have identified the gratuitous nature of the ruling on a grievance that was *not* before Wallin.

158.   The ALPA members on the executive board had a duty and obligation to request that the language addressing Delta's motive underlying the initiation of the

Section 15 hearing, which had nothing to do with the grievances before the board and could have a deleterious impact on Petitt's AIR 21 claim, be removed from the ruling. The arbitrator's ruling on the grievances before him in no way required him to address the very issue that parties agreed should not be considered as before the System Board. Nevertheless, at the very least a written dissent objecting to Wallin's dictum regarding Delta's motivation should have been made. It was not.

159.    ALPA actions were arbitrary, discriminatory, and taken in bad faith, in view of ALPA's failure to properly represent Petitt during the hearing and decisional process, including ALPA's tacit ratification of Delta counsel's representation that ALPA and Delta jointly opposed her grievances, proximately caused her loss of these grievances with attendant adverse consequences in her AIR 21 litigation.  ALPA hostility and disinterest in representing Petitt throughout the grievance process is at sharp variance with its representation of similarly situated male pilots.

### Summary Of Facts

160.    Petitt had filed grievance 16-11, as an avenue to return to work. Yet, ALPA made no effort to assist her in that process and the Association enabled company delays and canceled hearing dates, yet never fought for extensions on Petitt's behalf. After Petitt's reinstatement obtained through her own efforts and expense, ALPA insisted upon Wittenberg as the arbitrator for grievance 16-11, the same arbitrator that Delta's attorney had *ex parte* communications with, Petitt requested to be struck off months earlier, and later Delta requested to serve as a mediator. ALPA refused to support Petitt's position that Delta adhere to OSHA's arbitral due process standards, including Petitt's participation in the arbitrator selection process, in response to Delta's request for the OSHA investigator to defer the AIR 21 investigation until the grievance arbitration

had been completed. ALPA refused to acknowledge the ALJ's ruling that Petitt's AIR 21 case was not subject to Railway Labor Act preemption. ALPA demanded that Petitt comply with the Association's selection of hearing dates, and refused to work with Petitt's schedule. ALPA has a history of accommodating male pilots with the willingness to change of arbitrators, yet, ALPA refused Petitt the same option. Petitt was finally forced to drop grievance 16-11 due to ALPA working with the company to control the grievance process.

161.    Petitt relied upon ALPA and the grievance process with respect to the dozen contractual violations that had occurred after she had been placed into the Section 15 process. However, at the October 15, 2019 hearing, Petitt learned that ALPA had committed multiple procedural violations that created timing issues, which Delta exploited to craft arguments that would bar her claims. Never has this process or procedural violations transpired in this manner with the male pilots. ALPA engaged in the ultimate betrayal, as her counsel sat silent while Delta's attorney communicated to the arbitrator that both ALPA and Delta were jointly opposed to Petitt's grievances. This communication ensured that Wallin could safely deny any grievance submitted by Petitt, irrespective of its merit. However, ALPA pattern and practice of working with the company to defeat Petitt's legitimate grievances did not end there.

162.    Regardless of ALPA counsel emphasizing the importance of Petitt's AIR 21 action, based on the improper motive underlying Delta's Section 15 referral, not be addressed in *any manner*, and all parties concurring with that limitation at the October 15 hearing, ALPA's System Board representatives and legal team allowed the language to remain in the ruling under guise of addressing a grievance that was not even before the System Board. ALPA not only stood by and watched Delta attempt to destroy Dr. Petitt's career throughout the Section 15 process, but in many areas assisted Delta, and in the final hour made every effort to sabotage her AIR 21 complaint

based upon an ALPA/Delta orchestrated event and the gratuitous dictum contained in the Wallin decision of January 27, 2020.

## IV.   CAUSE OF ACTION

## COUNT 1: GENDER DISCRIMINATION

163.     Plaintiff incorporates the allegations contained in Paragraphs 1 through 161 above as if fully stated herein and alleges that ALPA failed to represent her, and proceeded in a manner that was arbitrary, discriminatory, and in bad faith due to her gender. The failure of the Defendant Air Line Pilot Association to fairly represent Plaintiff Karlene Petitt over the preceding five years was dramatically manifested in its ratification of Delta's representation to Arbitrator Wallin during the October 15 hearing that both parties – Delta and ALPA – jointly opposed her grievances thereby inviting him to deny her grievances regardless of their merit.  Finally, the manner in which ALPA's System Board members and legal counsel allowed gratuitous dictum to be incorporated into the decision in a manner designed to defeat her AIR 21 claim, despite the parties' prior agreement that the issue of motivation underlying the Section 15 was not within the System Board's jurisdiction, was arbitrary, discriminatory and bad faith.

164.     The effect of Defendant's failure to fairly represent Karlene Petitt in a reasonable manner is a violation of Title VII, based upon gender discrimination.  But for the arbitrary, discriminatory and deliberate, bad faith actions of ALPA born of gender discrimination, Petitt would never have been forced into a psychiatric evaluation for reporting safety, if so, she would have only have lost a month of her career, not two years, she would have had her AIR 21 ruling by May 1, 2020, and would not have had to face extensive attorney bills to save her career and defend against Delta's frivolous motion based upon the Walling January 27, 2020 ruling.

165.    ALPA is a male-dominated organization that focuses their support on the men. As recently as January 1, 2020, ALPA National Bylaws identified only with the male pilot by referencing to pilots as he or him.  Petitt's filing of an EEOC claim encouraged ALPA to edit those Bylaws with her EEOC filing, in that ALPA changed the contractual language to "they" versus "him" as of August, 2020. However, DALPA, Delta ALPA's contract, to date, references only "he" without acknowledging female pilots.

## V.  CONCLUSION

166.    ALPA's stubborn indifference and hostility to Petitt's grievances, and failure to represent her, is in sharp contrast to its ardent advocacy of similarly situated male pilots.  In one particularly striking comparison Delta Air Lines forced both Protack and Petitt into a psychiatric evaluation with Dr. Altman. Yet in Protack's case, ALPA attorney, Rose, wrote a letter to Delta on behalf of Protack, excoriating Dr. Altman, and expressing all the reasons that Protack should not have to be evaluated by this ethically compromised doctor. In Petitt's case, however, Rose and attorney Samuda both inaccurately conveyed that they had no knowledge of Dr. Altman. Despite Petitt's protest that she not be required to return to the abusive psychiatric evaluation, where on the first day Petitt was locked in a room with him for seven hours, alone, without a break and where she was interrogated with such abusive questions as how she expressed her milk thirty years earlier, ALPA still forced Petitt to see Altman in order to continue the process. ALPA allowed Captain Protack to change arbitrators because he did not like the choice provided. With Petitt, however, they forced her into a company-selected arbitrator bypassing the contractual strike-off process, and disregarded her scheduling conflicts and her well-reasoned requests for another arbitrator. Captain Protack experienced a harassment-free grievance process, free from personal attack where he was supported by ALPA. Whereas Ms. Petitt was verbally attacked by opposing

counsel, while her ALPA counsel remained silent. ALPA knew Captain Larry Troyer attended cognitive training prior to his neuropsychological testing, yet they refused to support the same accommodations for Ms. Petitt. Instead, Rose advised her to take an unpaid leave to avoid the testing. A suggestion which, if she had followed, would have resulted in the end of her career.

## VI.   PRAYER FOR RELIEF

**WHEREFORE,** Petitt respectfully request that the Court enter judgment in her favor against the Air Line Pilots Association awarding:

i.      Damages resulting from the breach of duty of fair representation owed to Petitt, consisting, *inter alia*:  all dues reimbursed from November 9, 2015 to present; 12 months equivalent DPMA payment; attorney fees incurred during time, and/or as a result, of lack of representation; pain and suffering; medical bills incurred as a result of the Section 15 referral; lost wages; financial loss and additional expense, including attorney's fees, arising from Delta's assertion of the collateral estoppel claim based on the Wallin uncontested and gratuitous language in his decision; any financial loss in the AIR 21 findings due to the arbitrary, discriminatory, and  bad faith acts of ALPA in its failure to represent, and  any expense in the form of legal fees and lost damages if Delta appeals the AIR 21 ruling, in whole  or part, based on grievances 18-13, 19-05 and 16-11 and/or utilizes the Wallin ruling. And that the court issue an injunction ordering the defendant to fairly represent the plaintiff in all future matters and to cease and desist from any interference with plaintiff's efforts to enforce Petitt's contractual rights in her employment relationship with Delta Airlines.

Defendant prays that the Court will make Dr. Karlene Petitt whole by awarding her the requested reimbursement (plus interest) and cost of suit;

ii      Award such further relief as the Court deems just and proper.

Respectfully submitted this 23rd day of October, 2020.

10 / 23 / 2020

Karlene Petitt
19671 Military Rd. S
SeaTac WA 98188
(206) 856-2445
Karlene.Petitt.com